# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN P. MOORE, Derivatively on Behalf of MARRIOTT INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> J.W. MARRIOTT, JR., MARY K. BUSH, BRUCE W. DUNCAN, DEBORAH M. HARRISON, FREDERICK A. HENDERSON, ERIC HIPPEAU, LAWRENCE W. KELLNER, DEBRA L. LEE, AYLWIN B. LEWIS, GEORGE MUÑOZ, STEVEN S. REINEMUND, SUSAN C. SCHWAB, and ARNE M. SORENSON, <br><br> Defendants, <br><br> and, <br><br> MARRIOTT INTERNATIONAL, INC., <br><br> Nominal Defendant. | Index No: <br><br> **VERIFIED SHAREHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff John P. Moore ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Marriott International, Inc. ("Marriott" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Marriott with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought in the right, and for the benefit, of Marriott against certain of its directors seeking to remedy the Director Defendants' (defined herein) breach of fiduciary duties, corporate waste, gross mismanagement, and violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 that occurred from November 9, 2016 to the present (the "Relevant Period"), and which has caused substantial harm to Marriott.

2.       Marriott operates, franchises, and licenses hotel, residential, and timeshare properties worldwide.  Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") has described itself as a hotel and leisure company, with hotel brands that include the W Hotels, St. Regis, and Le Meridien.

3.       On November 16, 2015, Marriott and Starwood announced their plan to merge Starwood into Marriott creating the world's largest hotel company.  On September 23, 2016 Marriott announced that this merger was completed.

4.       This action relates to a data breach of the Starwood guest database affecting approximately 500 million guests, and which began sometime in 2014 continuing through most of 2018, Marriott's failure to discover this breach or any Starwood security weaknesses during its merger due diligence, and its continuing false and/or misleading statements to the investing public about the adequacy of its data security.  Marriott disclosed this data breach event to the investing public on November 30, 2018.

## JURISDICTION AND VENUE

5.       Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over

the remaining claims under 28 U.S.C. § 1367.

6.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Marriott maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Marriott, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

8.      ***Plaintiff John P. Moore*** ("Plaintiff") is, and was at relevant times, a shareholder of Marriott.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

9.      ***Nominal Defendant*** Marriott operates, franchises, and licenses hotel, residential, and timeshare properties worldwide. The Company is incorporated in Delaware with locations throughout the world, including New York. The Company's securities are traded on the NASDAQ

under the ticker symbol "MAR".

**Director Defendants**

10.     *Defendant J.W. Marriott, Jr.* ("JW Marriott") has served as a director of Marriott since 1964 and has been Chairman of the Board since 1985.   JW Marriott was elected Executive Chairman effective March 31, 2012. He served as Chief Executive Officer ("CEO") of the Company and its predecessors since 1972.  He joined Marriott Corporation (formerly Hot Shoppes, Inc.) in 1956, became President in 1964 and CEO in 1972.  JW Marriott relinquished his CEO position in 2012 when he was elected Executive Chairman.  JW Marriott has continuously been the Chair of the Company's Executive Committee since at least 2015.  Also, JW Marriott is the father of Defendant Deborah M. Harrison.

11.     *Defendant Mary K. Bush* ("Bush") has served on the Marriott Board since 2008. Bush has continuously been a member of Marriott's Audit Committee and Compensation Policy Committee since at least 2015.

12.     *Defendant Bruce W. Duncan* ("Duncan") has served on the Marriott Board since 2016.  Duncan was a member of Marriott's Finance Committee in 2016 and 2017 and is presently a member of Marriott's Audit Committee.  Before joining Marriott, Duncan was a Director of Starwood since 1999, served on Starwood's Corporate Governance and Nominating Committee, and was its Chairman of the Board at the time of the merger.

13.     *Defendant Deborah M. Harrison* ("Harrison") has served on the Marriott Board since 2014.   Harrison was a member of Marriott's Committee for Excellence and Finance Committee from at least 2015 through 2017.  Harrison is also the daughter of Defendant JW Marriott.

14.     *Defendant Frederick A. Henderson* ("Henderson") has served on the Marriott

Board since 2013. Henderson has continuously been the Chairman of Marriott's Audit Committee since at least 2015 and is presently a member of Marriott's Nominating and Corporate Governance Committee.

15.     *Defendant Eric Hippeau* ("Hippeau") has served on the Marriott Board since 2016. Hippeau joined Marriott's Compensation Policy Committee on September 23, 2016 and has continuously served on that committee since that date. Before joining Marriott, Hippeau was a Director of Starwood since 1999, and served on Starwood's Audit Committee and Compensation and Option Committee.

16.     *Defendant Lawrence W. Kellner* ("Kellner) has served on the Marriott Board since 2002. Kellner has continuously been the Chairman of Marriott's Nominating and Corporate Governance Committee since at least 2015 and was a member of Marriott's Finance Committee from at least 2015 through 2017. Kellner was also a member of Marriott's Audit Committee in 2015.

17.     *Defendant Debra L. Lee* ("Lee") has served on the Marriott Board since 2004. Lee has continuously been the Chairman of Marriott's Audit Committee and a member of its Nominating and Corporate Governance Committee since at least 2015.

18.     *Defendant Aylwin B. Lewis* ("Lewis") has served on the Marriott Board since 2016. Lewis joined Marriott's Audit Committee on September 23, 2016 and has continuously served on that committee since that date. Lewis is also presently a member of Marriott's Compensation Policy Committee. Before joining Marriott, Lewis was a Director of Starwood since 2013 and served on Starwood's Audit Committee, and Capital Committee.

19.     *Defendant George Muñoz* ("Muñoz") has served on the Marriott Board since 2002. Muñoz joined Marriott's Audit Committee on September 23, 2016 and has continuously served on

that committee since that date.  He has also continuously been a member of Marriott's Committee for Excellence since at least 2015 and was a member of Marriott's Finance Committee in 2015.

20.     **Defendant Steven S. Reinemund** ("Reinemund") has served on the Marriott Board since 2007.  Reinemund has continuously been the Chairman of Marriott's Compensation Policy Committee and a member of its Nominating and Corporate Governance Committee and Executive Committee since at least 2015.

21.     **Defendant Susan C. Schwab** ("Schwab") has served on the Marriott Board since 2015.  Schwab has continuously been a member of Marriott's Compensation Policy Committee since at least 2015 and was a member of Marriott's Finance Committee from 2015 through 2017.

22.     **Defendant Arne M. Sorenson** ("Sorenson") has served on the Marriott Board since 2011.  He became President and CEO of the Company on March 31, 2012. Prior to that, he was President and Chief Operating Officer of the Company since May 2009.  Sorenson joined Marriott in 1996 as Senior Vice President of Business Development and was appointed Executive Vice President and Chief Financial Officer in 1998, and assumed the additional title of President, Continental European Lodging, in January 2003.  Sorenson has continuously been a member of Marriott's Executive Committee and Committee for Excellence since at least 2015.

23.     The following is a chart of all Board members' Committee membership, as presently listed on its website and in its Form DEF 14A filed with the SEC on April 4, 2018 (the "2018 Proxy"), its Form DEF 14A filed with the SEC on April 5, 2017 (the "2017 Proxy"), and its Form DEF 14A filed with the SEC on April 5, 2016 (the "2016 Proxy")[1]:

---

[1]     Mr. Romney is included in this chart although he resigned from the Board effective November 8, 2018 (*see* ¶ 25).

| Director | Director Since | Audit | | | | Compensation Policy | | | | Finance | | | | Nominating and Corporate Governance | | | | Committee for Excellence | | | | Executive | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 | 2015 | 2018 | 2017 | 2016 | 2015 |
| J.W. Marriott, Jr. | 1964 | | | | | | | | | | | | | | | | | | | | | Chair | Chair | Chair | Chair |
| Mary K. Bush | 2008 | x | x | x | x | x | x | x | x | | | | | | | | | | | | | | | | |
| Bruce W. Duncan | 2016 | x | | | | | | | | | | | | | | | | | | | | | | | |
| Deborah M. Harrison | 2014 | | | | | | | | | x | x | | | | | | | x | x | x | | | | | |
| Frederick A. Henderson | 2013 | Chair | Chair | Chair | Chair | | | | | | | | | | | | | | | | | | | | |
| Eric Hippeau | 2016 | | | | | x | x | x | | | | | | | | | | | | | | | | | |
| Lawrence W. Kellner | 2002 | | | | x | | | | | x | x | x | x | Chair | Chair | Chair | Chair | | | | | x | x | x | x |
| Debra L. Lee | 2004 | | | | | | | | | x | | | | | | | x | Chair | Chair | Chair | Chair | | | | |
| Aylwin B. Lewis | 2016 | x | x | x | | x | | | | | | | | | | | | | | | | | | | |
| George Muñoz | 2002 | x | x | x | | | | | | | | | | | | | x | x | x | x | | | | | |
| Steven S Reinemund | 2007 | | | | | Chair | Chair | Chair | Chair | | | | | x | x | x | x | | | | | x | x | x | x |
| W. Mitt Romney | 2012 | | | | | | | | | | Chair | Chair | Chair | Chair | Chair | | | | | | | | | | |
| Susan C. Schwab | 2015 | | | | | x | x | x | x | x | x | x | | | | | | | | | | | | | |
| Arne M. Sorenson | 2011 | | | | | | | | | | | | | | | | | x | x | x | x | x | x | x | x |

24.     Defendants JW Marriott, Bush, Duncan, Harrison, Henderson, Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund, Schwab, and Sorenson are referred to herein as the "Director Defendants".

**Former Directors**

25.     W. Mitt Romney ("Romney") served on the Marriott Board since 2012.  Romney continuously was the Chairman of Marriott's Finance Committee from at least 2015 through 2017. On November 9, 2018 Marriott filed a Form 8-K with the SEC announcing that on November 8, 2018 Romney resigned from the Board of Directors of Marriott effective that date.  The Form 8-K provides that "Mr. Romney stated that he is resigning because he would not be able to continue to commit sufficient time and attention to Marriott and its shareholders as he pursues his plans for the future.  Mr. Romney did not resign on account of any disagreement with Marriott's operations, policies or procedures."

**Non-Party Corporate Officers**

26.     Bao Giang Val Bauduin ("Bauduin") presently is Marriott's Controller and Chief Accounting Officer and has served in that role since 2014.   As described in Marriott's annual report for the fiscal year ended December 31, 2017 filed on Form 10-K and filed with the SEC on February 15, 2018 (the "2017 10-K"), Bauduin is responsible for the accounting operations of the Company including oversight of Financial Reporting & Analysis, Accounting Policy, Governance,

and Risk Management.  Bauduin is also a Certified Public Accountant.

27.     Kathleen "Leeny" Kelly Oberg ("Oberg") presently is Marriott's Chief Financial Officer ("CFO") and has served in that role since January 1, 2016.  As described in the Company's 2017 10-K, Oberg first joined Marriott as part of its Investor Relations group in 1999.  From 2008 to 2013, she was the Company's Senior Vice President, Corporate and Development Finance, where she led a team that valued new hotel development projects and merger and acquisition opportunities, prepared the Company's long-range plans and annual budgets, and made recommendations for the Company's financial and capital allocation strategy.  From 2006 to 2008, Oberg served in London as Senior Vice President, International Project Finance and Asset Management for Europe and the Middle East and Africa, and as the region's senior finance executive.

## MARRIOTT'S CORPORATE GOVERNANCE

28.     As members of Marriott's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

29.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Marriott, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

30.     As stated in Marriott's 2018 Proxy, its Board has six standing committees: Audit, Compensation Policy, Finance, Nominating and Corporate Governance, Committee for Excellence, and Executive.  Marriott further represents that its Board has adopted a written charter for each committee, and those charters are available on the Investor Relations section of its

website.[2]  However, a search of Marriott's website demonstrates that the Finance Committee is not listed and no charter for the Finance Committee was published on the Marriott website.  In fact, when one clicks on the link provided for Marriott's "Board Committees" a document opens entitled "Marriott International, Inc., Committees of the Board", which document lists all committees and its members **except** the Finance Committee (attached as Exhibit A).

31.     Marriott maintains a Business Conduct Guide which is available to the investing public on its website.  It begins with a quote from Defendant JW Marriott stating "***Our business relies on integrity and good judgment***."  (Emphasis added).  This Business Conduct Guide further states in relevant part:

**What is Expected of Everyone?**

As Marriott associates, officers, directors, or other persons acting on behalf of Marriott (collectively "associates"), you are expected to be familiar with and work within the code of business conduct detailed in this Business Conduct Guide.

* * *

**Who is Responsible?**

All Marriott associates are responsible for upholding the legal, ethical, and social standards detailed in the Business Conduct Guide.

* * *

**Customer and Associate Privacy**

There are strict policies concerning the disclosure of information about Marriott guests and associates.

There are only limited circumstances in which private information of associates or customers may be disclosed outside of Marriott.

You are responsible for reviewing and understanding Marriott policies before you release information about Marriott customers and associates.  Other than the exceptions expressly identified in Marriott policies, you may not disclose records

---

[2]     *See* the 2018 Proxy, p. 27 at
https://www.sec.gov/Archives/edgar/data/1048286/000119312518107480/d539777ddef14a.htm#toc539777_16.

and information concerning present or former customers or associates.

This private information includes any Personally Identifiable Information (PII), which can be associated with or traced to an individual, such as:

> *Name, address, telephone number, e-mail address, government issued identifications (e.g., Social Security Number), health records, credit card information, or other financial information.*

> ***Information concerning customers and associates must be safeguarded*** and should be used only for legitimate business purposes and should not be shared, even with Marriott, except on a need-to-know basis. [Emphasis added]

**More Information**:

Consult **MIP-47 ("Personal Information Privacy")** for more information regarding PII.

32.     Although Marriott refers to its MIP-47 (regarding Personal Information Privacy) in its Business Conduct Guide, this document does not appear on Marriott's website using that title or reference number and is not otherwise available to the investing public.

33.     Marriott's Governance Principles (Revised May 6, 2016) states in relevant part:

**Director Qualifications**. The board's Nominating and Corporate Governance Committee selects director candidates based on character, judgment, business and professional experience and reputation, personal and professional ethics, integrity, values and familiarity with national and international issues affecting business. Board members are selected who not only bring a depth of experience but also provide skills and knowledge complementary to the board and Marriott's business. Candidates must be committed to representing the long-term interests of the shareholders.

* * *

**Ethics and Conflicts of Interest**. The board expects Marriott's directors, officers and employees to act ethically at all times and acknowledge their adherence to Marriott's Code of Ethics, and Marriott's officers and directors to follow Marriott's Business Conduct Guide….

* * *

**Access to Independent Advisors**. The board and its committees have the

responsibility at any time to retain independent outside financial, legal or other advisors if at any time such advice is required to fulfill their obligations

**Director Orientation**. The general counsel and the chief financial officer provide an orientation for new directors, and periodically provide materials or briefing sessions for all directors on subjects that would assist them in discharging their duties….

34.    Marriott's Amended and Restated Audit Committee Charter (as of August 6, 2015)

states in relevant part:

Purpose; Statement of Policy

The purpose of the Audit Committee (the "Committee") is to represent and assist the Board of Directors in overseeing: (i) the accounting, reporting, and financial practices of the Company and its subsidiaries, including the integrity of the Company's financial statements; (ii) ***the Company's internal control environment and compliance with legal and regulatory requirements***; (iii) the independent auditors' qualifications and independence; and (iv) the performance of the Company's internal audit function and the independent auditor.

\* \* \*

Duties and Responsibilities

Consistent with and subject to applicable law and rules or listing standards promulgated by the SEC, NASDAQ, or other applicable regulatory authority, the Committee shall have the following duties and responsibilities.

\* \* \*

*Risk Assessment and Control Environment*

The Committee will periodically review and discuss the Company's business and financial risk management and risk assessment policies and procedures with senior management, the Independent Auditor, and the Chief Audit Executive

*Internal Controls and Disclosure Controls and Procedures*

The Committee will periodically review and discuss with the internal auditors and the Principal Independent Auditor the adequacy and effectiveness of the Company's internal control environment, including any significant deficiencies or material weaknesses and any significant changes in internal controls that are required to be disclosed in the Company's

periodic filings. The Committee will also review the annual report of the Principal Independent Auditor on the Company's internal controls over financial reporting. In connection with this review, the Committee will obtain and discuss:

1. Reports from the Chief Executive Officer, the Chief Financial Officer, and the Principal Independent Auditor on any significant deficiencies in the design or operation of internal controls with the identification of any material weakness;

2. Any fraud or other irregularity (whether or not material) that involves management or other employees who have a significant role in the Company's internal control environment; and

3. Management's evaluations of the Company's internal controls over financial reporting and disclosure controls and procedures.

* * *

*Compliance*

The Committee will oversee the Company's compliance systems with respect to legal and regulatory requirements and review the Company's compliance policies and its programs to monitor compliance with these policies. In this regard, the Committee will:

1. At least annually review with management, the General Counsel, and the Chief Audit Executive the Company's programs to promote compliance with its Ethical Conduct Policy (MIP-1) and the Business Conduct Guide. These policies will be posted on the Company's public website; and

2. Establish and oversee a procedure for the oversight and reporting to the Committee of the receipt, retention, treatment, and closure of complaints to the Company concerning (i) accounting, internal accounting controls, or auditing matters; or (ii) the confidential, anonymous submission by Company employees regarding questionable accounting or auditing matters.

3. Review findings of regulatory agencies' examination.

* * *

*Investigations*

12

The Committee may investigate suspected improprieties on any material matter, using special counsel or outside experts when necessary or appropriate.  [Emphasis added]

35.     Marriott's Amended and Restated Nominating and Corporate Governance Committee Charter (Revised August 6, 2015) states in relevant part:

**Duties and Responsibilities**

A.     The Committee's duties and responsibilities shall be as follows:

* * *

o   To review and, as appropriate, make recommendations regarding the effective functioning of the Board such as the quality, quantity and timeliness of information furnished to Directors and frequency and location of Board meetings.

* * *

C.     The Committee shall develop and recommend to the Board for its approval a set of corporate governance principles. The Committee shall review the principles on a regular basis and recommend changes as necessary.

## DUTIES OF DEFENDANTS

36.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Marriott, the Director Defendants owed Marriott and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage Marriott in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Marriott and its investors.

37.     Each director of the Company owes to Marriott and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate

13

and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

38.     To discharge their duties, the officers and directors of Marriott were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Marriott were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Marriott conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

39.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Marriott, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

40.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, Marriott has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

**Background**

41.     Marriott is a worldwide operator, franchisor, and licensor of hotel, residential, and timeshare properties under numerous brand names at different price and service points.  It was organized as a corporation in Delaware in 1997 and became a public company in 1998 when it was "spun off" as a separate entity by the company formerly named "Marriott International, Inc."

42.     During the Relevant Period, Marriott collected and continues to collect credit card numbers, expiration dates and other relevant credit card information ("payment card data" or "PCD") and other personal information including, but not limited to, names, phone numbers, mailing and email addresses, passport numbers, birthdates, and/or Social Security numbers ("personally identifiable information" or "PII") from its customers (also described as "guests" by Marriott and herein).  This information was and is collected by Marriott when customers reserve rooms and/or check in at one of Marriott's properties, and possibly at other times.

43.     At all relevant times, Marriott and the Director Defendants knew (or were reckless in disregarding) the risks associated with its collection, use, and storage of its customers PCD and PII.  In fact, Marriott's Form 10-K for the fiscal year ended December 31, 2017 and filed with the SEC on February 15, 2018 (the "2017 10-K") discusses risks associated with its handling of this information under the section "Risks Relating to Our Business" which states in relevant part:

<u>Technology, Information Protection, and Privacy Risks</u>

* * *

*We are exposed to risks and costs associated with protecting the integrity and security of company employee and guest data.  **Our businesses process, use, and transmit large volumes of employee and guest data, including credit card numbers and other personal information** in various information systems that we maintain and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. **The integrity and protection of that guest, employee, and company data is critical to our business**. If that data is inaccurate or incomplete, we could make faulty decisions.*

***Our guests and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information**. The information, security, and privacy requirements imposed by laws and governmental regulation and the requirements of the payment card industry are also increasingly demanding, in the U.S., the European Union, Asia, and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able*

to satisfy these changing legal and regulatory requirements and employee and guest expectations, or may require significant additional investments or time to do so.

*Cyber-attacks could have a disruptive effect on our business*. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, operator error, or inadvertent releases of data may materially impact our information systems and records and those of our owners, franchisees, licensees, or service providers. Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years. *A significant theft, loss, loss of access to, or fraudulent use of guest, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation*. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits. In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, that insurance coverage may not be sufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all. [Emphasis added]

44.     Marriott's Form 10-K's for the fiscal years ended December 31, 2016 and December 31, 2015 contain substantially similar language regarding Technology, Information Protection, and Privacy Risks when compared to Marriott's 2017 10-K (and as set forth in ¶ 43). This language contained in Marriott's Form10-K's and other public filings gave (and gives) the false impression to the investing public that the systems storing Marriott and Starwood customer data (including PII and PCD) were secure.

45.     At all relevant times and in a further effort to assure its customers and the investing public, Marriott maintained and published its Global Privacy Statement on its website, which it updated from time to time.  Each statement lists the type of personal information it collects from its guests, which list includes PII and PCD data.  Regarding Security of Personal Information, Marriott's various Global Privacy Statements state:

17

(a)     <u>From May 21, 2015 - June 30, 2016</u>: "We treat the personal information you provide to us as confidential and take reasonable steps, including standard industry safeguards to protection your personal information from accidental deletion or loss and unauthorized access, disclosure or modification. When you submit personal information to us via our Websites, it is transferred over a Secured Sockets Layer (SSL) connection, provided you are using a SSL enabled browser or device."

(b)     <u>From July 1, 2016 - May 17, 2018</u>: "We seek to use reasonable organizational, technical and administrative measures to protect Personal Information within our organization. Unfortunately, no data transmission or storage system can be guaranteed to be 100% secure.  If you have reason to believe that your interaction with us is no longer secure (for example, if you feel that the security of your account has been compromised), please immediately notify us in accordance with the "Contacting Us" section below."

(c)     <u>From May 18, 2018 - February 3, 2019</u>: "We seek to use reasonable organizational, technical and administrative measures to protect Personal Data. Unfortunately, no data transmission or storage system can be guaranteed to be 100% secure. If you have reason to believe that your interaction with us is no longer secure (for example, if you feel that the security of your account has been compromised), please immediately notify us in accordance with the "Contacting Us" section, below."

• This version of the Global Privacy Statements adds for the first time a "Sensitive Data" section which states, "Unless specifically requested, we ask that you not send us, and you not disclose, on or through the Services or otherwise to us, any Sensitive Personal Data (*e.g.*, social security numbers, national

identification number, data related to racial or ethnic origin, political opinions, religion, ideological or other beliefs, health, biometrics or genetic characteristics, criminal background, trade union membership, or administrative or criminal proceedings and sanctions)."

(d)     <u>From February 4, 2019 – Present</u>: "We seek to use reasonable organizational, technical and administrative measures to protect Personal Data. Unfortunately, no data transmission or storage system can be guaranteed to be 100% secure. If you have reason to believe that your interaction with us is no longer secure (for example, if you feel that the security of your account has been compromised), please immediately notify us in accordance with the "Contacting Us" section, below."

- This version of the Global Privacy Statements includes a "Sensitive Data" section with the same language as quoted above.

46.     Starting in 2014, Starwood suffered a data breach of its guest reservation database which contained customer PII and PCD information, ultimately affecting as many as 500 million of its guests.  This data breach continued into 2018.  This event would later be described as ". . . one of the biggest data breaches on record" (the "2014 Starwood data breach"). [3]

47.     On November 16, 2015, Marriot filed a Form 8-K with the SEC and issued a joint press release with Starwood announcing that ". . . the boards of directors of both companies have unanimously approved a definitive merger agreement under which the companies will create the world's largest hotel company."

48.     On the heels of this merger announcement, on November 20, 2015, Starwood disclosed that more than 50 of its hotels had been infected by a malware attack designed to help

---

[3]     *See* November 30, 2018 *Chicago Tribune* article, "Marriott security breach exposed data of up to 500 million guests", at https://www.chicagotribune.com/business/ct-marriott-data-breach-20181130-story.html

cyber thieves steal credit and debit card data (the "2015 Starwood data breach").  This data breach

and disclosure is separate and distinct from the 2014 Starwood data breach discussed in ¶ 46,

*supra*.  As stated in a *Krebs on Security* article[4]:

> Starwood Hotels & Resorts Worldwide today warned that malware designed to help
> cyber thieves steal credit and debit card data was found on point-of-sale cash
> registers at some of the company's hotels in North America. ***The disclosure makes
> Starwood just the latest in a recent string of hotel chains to acknowledge credit
> card breach investigations, and comes days after the company announced its
> acquisition by Marriott International***. [Emphasis added]

49.     On December 22, 2015, Marriott filed its Form S-4 with the SEC (the "2015

Proxy"), which asked for shareholder vote approving the Marriott/Starwood merger.  In the 2015

Proxy, both companies recommended that their shareholders vote for the then-proposed merger.

When discussing risk factors, the 2015 Proxy was silent on the November 20, 2015 Starwood

announced malware attack (*i.e.*, the 2015 Starwood data breach) or more generally, risks associated

with Technology, Information Protection, and Privacy Risks.[5]  The 2015 Proxy does not mention

or discuss "personal information", "PCD", "PII", or the data breaches discussed herein.

50.     On January 27, 2016, Marriott filed its Form S-4/A with the SEC (the "2015 Proxy

Amendment 1") which asked for shareholder vote approving the Marriott/Starwood merger.  On

February 16, 2016 Marriott filed its Form S-4/A with the SEC (the "2015 Proxy Amendment 2")

which also asked for shareholder vote approving the Marriott/Starwood merger.  Neither of these

Proxy Statements mentioned or discussed "personal information", "PCD", "PII", or the data

breaches discussed herein.

---

[4]     This November 20, 2015 article entitled "Starwood Hotels Warns of Credit Card Breach" can be found at
https://krebsonsecurity.com/2015/11/starwood-hotels-warns-of-credit-card-breach/.

[5]     The 2015 Proxy, under "Risks Related to Starwood's (and separately, Marriott's) Business", refers interested
parties to each company's Form 10-K to seek out additional risk information.   Buried therein is limited disclosure of
cyber threats.

51.     On September 23, 2016, Marriott filed a Form 8-K with the SEC and published a press release announcing that it had completed its acquisition of Starwood.  At that same time, Marriott announced it had expanded its Board of Directors from eleven (11) to fourteen (14) and added former Starwood Directors to the Marriott Board; namely, Defendants Duncan, Hippeau, and Lewis.

52.     On September 23, 2016, Starwood also updated its Online Privacy Statement.  In defining Starwood's mission, it states that Starwood is ". . . dedicated to protecting your privacy and safeguarding your personal data."  Under "Security Safeguards", Starwood goes on to state:

> Starwood recognizes the importance of information security, and is constantly reviewing and enhancing our technical, physical, and logical security rules and procedures. All Starwood owned web sites and servers have security measures in place to help protect your personal data against accidental, loss, misuse, unlawful or unauthorized access, disclosure, or alteration while under our control. Although "guaranteed security" does not exist either on or off the Internet, we safeguard your information using appropriate administrative, procedural and technical safeguards, including password controls, "firewalls" and the use of up to 256-bit encryption based on a Class 3 Digital Certificate issued by VeriSign, Inc. This allows for the use of Secure Sockets Layer (SSL), an encryption method used to help protect your data from interception and hacking while in transit.

53.     Following the completion of the Marriott/Starwood merger, Marriott kept the loyalty programs for each brand (Marriott and Starwood) separate.  On information and belief, this resulted in Marriott taking control, responsibility, and use of the Starwood database which was at the heart of the 2014 Starwood data breach.  As stated in an April 18, 2018 *Forbes* article entitled "Details Surrounding the Marriott and Starwood Merger":

> In the beginning, Marriott chose to keep loyalty programs for the two hotel brands completely separate; that is, customers could book Marriott hotels with Marriott Rewards Points and Starwood hotels with SPG Starpoints. Additionally, members had the opportunity to link both accounts in order to enjoy elite status in both programs and switch between point currencies at an exchange rate of one SPG Starpoint for every three Marriott Rewards Points. This pleased Starwood account holders, as it respected the value of SPG Starpoints and made sure that the merger would work for both parties.

21

Upon closing, the plan was to eventually build a newer, stronger loyalty program that played to the strengths of each one. "Marriott will draw upon the very best each program offers and we can't wait to show the loyal members of these programs the power and benefits of Marriott and Starwood coming together," explains Executive Vice President and Global Chief Commercial Officer Stephanie Linnartz.

## FALSE AND MISLEADING
## STATEMENTS MADE DURING THE RELEVANT PERIOD

54.     On November 9, 2016, Marriott filed its Form 10-Q for the quarterly period ended September 30, 2016 (the "3Q 2016 10-Q") with the SEC, which was signed by Bauduin. The 3Q 2016 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Sorenson and Oberg attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

55.     The 3Q 2016 10-Q gave the false impression to the investing public that systems storing Marriott and Starwood customer data were secure, stating in relevant part:

> *Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain* and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. *The integrity and protection of that customer, employee, and company data is critical to our business*….
>
> *Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information*. [Emphasis added]

56.     On February 21, 2017, Marriott filed its annual report for the fiscal year ended December 31, 2016 with the SEC on Form 10-K (the "2016 10-K"), which was signed by Defendant Sorenson and Oberg. The 2016 10-K contained signed SOX certifications by Defendant Sorenson and Oberg attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

57.     The 2016 10-K gave the misleading impression that systems storing Marriott and Starwood customer data were secure, stating in relevant part:

> *Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain* and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that customer, employee, and company data is critical to our business….

> *Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information*. [Emphasis added]

58.     On April 5, 2017 Marriott filed its DEF 14A with the SEC (the "2017 Proxy") announcing its annual meeting of shareholders on May 5, 2017.  This was the first annual meeting of shareholders after completion of the Marriott/Starwood merger.  The proposals to be voted on by Marriott shareholders at this annual meeting included election of the Director Defendants and an advisory vote to approve executive compensation.  The 2017 Proxy was silent on – and provided voting shareholders and the investing public with no information regarding – the 2014 Starwood data breach, the 2015 Starwood data breach, any information regarding Marriott's cyber security due diligence performed prior to completion of the Marriott/Starwood merger, or other meaningful information relating to Marriott's in-place or planned internal controls to protect its guests PII and/or PCD.

59.     On May 9, 2017 Marriott filed its Form 10-Q for the quarterly period ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC, which was signed by Bauduin. The 1Q 2017 10-Q contained SOX certifications signed by Defendant Sorenson and Oberg attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls

over financial reporting, and the disclosure of all fraud.

60.     The 1Q 2017 10-Q gave the false impression to the investing public that systems

storing Marriott and Starwood customer data were secure, stating in relevant part:

> ***Our businesses process, use, and transmit large volumes of internal employee and
> customer data, including credit card numbers and other personal information in
> various information systems that we maintain*** and in those maintained by third
> parties, including our owners, franchisees and licensees, as well as our service
> providers, in areas such as human resources outsourcing, website hosting, and
> various forms of electronic communications. The integrity and protection of that
> customer, employee, and company data is critical to our business....
>
> ***Our customers and employees also have a high expectation that we, as well as our
> owners, franchisees, licensees, and service providers, will adequately protect their
> personal information***. [Emphasis added]

61.     On August 8, 2017, Marriott filed its Form 10-Q for the quarterly period ended June

30, 2017 (the "2Q 2017 10-Q") with the SEC, which was signed by Bauduin. The 2Q 2017 10-Q

contained SOX certifications signed by Defendant Sorenson and Oberg attesting to the accuracy

of financial reporting, the disclosure of any material changes to the Company's internal controls

over financial reporting, and the disclosure of all fraud.

62.     The 2Q 2017 10-Q gave the false impression to the investing public that systems

storing Marriott and Starwood customer data were secure, stating in relevant part:

> ***Our businesses process, use, and transmit large volumes of internal employee and
> customer data, including credit card numbers and other personal information in
> various information systems that we maintain*** and in those maintained by third
> parties, including our owners, franchisees and licensees, as well as our service
> providers, in areas such as human resources outsourcing, website hosting, and
> various forms of electronic communications. The integrity and protection of that
> customer, employee, and company data is critical to our business.
>
> ***Our customers and employees also have a high expectation that we, as well as our
> owners, franchisees, licensees, and service providers, will adequately protect their
> personal information***. [Emphasis added]

63.     On November 8, 2017 Marriott filed its Form 10-Q for the quarterly period ended

September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which was signed by Bauduin. The 3Q

2017 10-Q contained SOX certifications signed by Defendant Sorenson and Oberg attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal

controls over financial reporting, and the disclosure of all fraud.

64.     The 3Q 2017 10-Q gave the false impression to the investing public that systems

storing Marriott and Starwood customer data were secure, stating in relevant part:

> ***Our businesses process, use, and transmit large volumes of internal employee and
> customer data, including credit card numbers and other personal information in
> various information systems that we maintain*** and in those maintained by third
> parties, including our owners, franchisees and licensees, as well as our service
> providers, in areas such as human resources outsourcing, website hosting, and
> various forms of electronic communications. The integrity and protection of that
> customer, employee, and company data is critical to our business.
>
> ***Our customers and employees also have a high expectation that we, as well as our
> owners, franchisees, licensees, and service providers, will adequately protect their
> personal information***. [Emphasis added]

65.     On February 15, 2018, Marriott filed its 2017 10-K with the SEC which was signed

by Defendant Sorenson, Oberg, Bauduin, and each of the Director Defendants. The 2017 10-K

contained signed SOX certifications by Defendant Sorenson and Oberg attesting to the accuracy

of financial reporting, the disclosure of any material changes to the Company's internal controls

over financial reporting, and the disclosure of all fraud.

66.     The 2017 10-K gave the misleading impression that systems storing Marriott and

Starwood customer data were secure, stating in relevant part:

> ***Our businesses process, use, and transmit large volumes of employee and guest
> data, including credit card numbers and other personal information in various
> information systems that we maintain*** and in systems maintained by third parties,
> including our owners, franchisees and licensees, as well as our service providers, in
> areas such as human resources outsourcing, website hosting, and various forms of
> electronic communications. The integrity and protection of that guest, employee,
> and company data is critical to our business….

25

*Our guests and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information.* [Emphasis added]

67.     On April 8, 2018 Marriott filed its DEF 14A with the SEC (the "2018 Proxy") announcing its annual meeting of shareholders on May 4, 2018.  This was the first annual meeting of shareholders after completion of the Marriott/Starwood merger.  The proposals to be voted on by Marriott shareholders at this annual meeting included election of the Director Defendants, an advisory vote to approve executive compensation, and removal of the supermajority shareholder vote for certain events.  The 2018 Proxy was silent on – and provided voting shareholders and the investing public with no information regarding – the 2014 Starwood data breach, the 2015 Starwood data breach, any information regarding Marriott's cyber security due diligence performed prior to completion of the Marriott/Starwood merger, or other meaningful information relating to Marriott's in-place or planned internal controls to protect its guests PII and/or PCD.

68.     Regarding the 2018 Proxy and its proposal to remove the requirement of supermajority shareholder vote for certain events, Marriott opposed this proposal, brought by one of its shareholders. At that time, approval of 66 2/3 of outstanding shares was required for certain events such as removing a director.  In support of its opposition to this proposal, Marriott asserted that it "…has an excellent corporate governance structure", and further stated in relevant part:

> The Company's Board is firmly committed to good corporate governance and has adopted a wide range of practices and procedures that promote effective Board oversight, and the Company has earned a reputation as being a leader in this area. The Board believes that the corporate governance concerns raised by the proponent are misplaced. Some of the Company's progressive governance policies and practices…

69.     On May 10, 2018, Marriott filed its Form 10-Q for the quarterly period ended March 31, 2018 (the "1Q 2018 10-Q") with the SEC, which was signed by Bauduin. The 1Q 2018 10-Q contained SOX certifications signed by Defendant Sorenson and Oberg attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

70.     The 1Q 2018 10-Q gave the false impression to the investing public that systems storing Marriott and Starwood customer data were secure, stating in relevant part:

> ***Our businesses process, use, and transmit large volumes of company, employee and guest data, including credit card numbers and other personal information in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that guest, employee, and company data is critical to our business….
>
> ***Our guests and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information***. [Emphasis added]

71.     On August 7, 2018, Marriott filed its Form 10-Q for the quarterly period ended June 30, 2018 (the "2Q 2018 10-Q") with the SEC, which was signed by Bauduin. The 2Q 2018 10-Q contained SOX certifications signed by Defendant Sorenson and Oberg attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

72.     The 2Q 2018 10-Q gave the false impression to the investing public that systems storing Marriott and Starwood customer data were secure, stating in relevant part:

> ***Our businesses process, use, and transmit large volumes of company, associate and guest data, including credit card numbers and other personal information in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that guest, associate, and company data is critical to our business….
>
> ***Our guests and associates also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information***. [Emphasis added]

73.     On November 6, 2018, Marriott filed its Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q 2018 10-Q") with the SEC, which was signed by Bauduin. The 3Q 2018 10-Q contained SOX certifications signed by Defendant Sorenson and Oberg attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

74.     The 3Q 2018 10-Q gave the false impression to the investing public that systems storing Marriott and Starwood customer data were secure, stating in relevant part:

> ***In the operation of our business, we collect, store, use, and transmit large volumes of data regarding associates, guests, customers, owners, licensees, franchisees, and our own business operations, including credit card numbers, reservation and loyalty data, and other personal information, in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees, licensees, and service providers.  The integrity and protection of this data is critical to our business….
>
> ***Our guests and associates also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect and appropriately use their personal information***. [Emphasis added]

75.     The 3Q 2018 10-Q provided the investing public with no information regarding the 2015 Starwood data breach, even though Marriott learned of this event in September 2018.

76.     The statements referenced above were materially false and/or misleading because Marriott misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them: (a) Marriott's and Starwood's systems that stored its customers' personal data were not secure; (b) there had been unauthorized access on Starwood's network since 2014; (c) consequently, the personal data of approximately 500 million Starwood guests may have been exposed to unauthorized parties; (d) Marriott failed to complete adequate cyber security due diligence during the Marriott/Starwood merger; (e) Marriott lacked internal controls to timely

detect data breaches; and (f) as a result, Marriott's public statements were materially false and/or misleading at all relevant times.

## **THE TRUTH EMERGES**

77.     On November 30, 2018 Marriott published a press release entitled "Marriott Announces Starwood Guest Reservation Database Security Incident" which disclosed that it suffered a data breach which exposed the personal information of up to 500 million of its guests and which has been ongoing since 2014.  This press release states in relevant part:

> Marriott has taken measures to investigate and address a data security incident involving the Starwood guest reservation database.  On November 19, 2018, the investigation determined that there was unauthorized access to the database, which contained guest information relating to reservations at Starwood properties on or before September 10, 2018.

> On September 8, 2018, Marriott received an alert from an internal security tool regarding an attempt to access the Starwood guest reservation database in the United States.  Marriott quickly engaged leading security experts to help determine what occurred.  ***Marriott learned during the investigation that there had been unauthorized access to the Starwood network since 2014***.  The company recently discovered that an unauthorized party had copied and encrypted information, and took steps towards removing it.  On November 19, 2018, Marriott was able to decrypt the information and determined that the contents were from the Starwood guest reservation database.

> ***The company has not finished identifying duplicate information in the database, but believes it contains information on up to approximately 500 million guests who made a reservation at a Starwood property***.  For approximately 327 million of these guests, the information includes some combination of name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences.  For some, the information also includes payment card numbers and payment card expiration dates, but the payment card numbers were encrypted using Advanced Encryption Standard encryption (AES-128).  There are two components needed to decrypt the payment card numbers, and at this point, Marriott has not been able to rule out the possibility that both were taken.  For the remaining guests, the information was limited to name and sometimes other data such as mailing address, email address, or other information.

> Marriott reported this incident to law enforcement and continues to support their investigation.  The company has already begun notifying regulatory authorities.

*"We deeply regret this incident happened," said Arne Sorenson, Marriott's President and Chief Executive Officer. "We fell short of what our guests deserve and what we expect of ourselves*. We are doing everything we can to support our guests, and using lessons learned to be better moving forward."

"Today, Marriott is reaffirming our commitment to our guests around the world. We are working hard to ensure our guests have answers to questions about their personal information, with a dedicated website and call center. We will also continue to support the efforts of law enforcement and to work with leading security experts to improve. Finally, we are devoting the resources necessary to phase out Starwood systems and accelerate the ongoing security enhancements to our network," Mr. Sorenson continued. [Emphasis added]

78.    On November 30, 2018, Marriott also filed a Form 8-K with the SEC relating to the 2014 Starwood data breach. In addition to attaching the press release discussed above (*see* ¶ 81), Marriott included answers to what it represented were "…certain frequently asked questions related to the cybersecurity incident…", stating:

What will be the financial impact to the Company from this cybersecurity incident?

It is premature to estimate the financial impact to the Company. The Company carries insurance, including cyber insurance, commensurate with its size and the nature of its operations. The Company is working with its insurance carriers to assess coverage.

How will the Company disclose the costs related to this incident in its financial statements and public filings?

The Company expects it will separately disclose costs specifically related to this incident, as well as any corresponding insurance reimbursements. The timing of recognition of related costs may differ from the timing of recognition of any insurance reimbursement.

What will be the impact to the Company's long-term financial health from this incident?

The Company does not believe this incident will impact its long-term financial health. As a manager and franchisor of leading lodging brands, the Company generates meaningful cash flow each year with only modest capital investment needed to grow the business. The Company remains committed to maintaining its investment grade credit rating.

79.     Following Marriott's November 30, 2018 disclosure of the 2014 Starwood data breach, on November 30, 2018 *CNBC* published an article entitled "The Marriott hack that stole data from 500 million people started four years ago — investors should ask how the company missed it" which stated in relevant part (and posed the questions which are central to this action):

> The Marriott breach has the sheer numbers and brand star power to make people take notice: 500 million people were affected, including possibly anyone who stayed at ubiquitous Marriott and Starwood properties across the globe. An unknown attacker stole information including emails, names, addresses, passport numbers and possibly payment card information, in a slow-moving attack that lasted four years.
>
> The breach itself isn't terribly unusual except for two critical questions:
>
> - ***Why did its security systems fail to detect a breach until four years after it started?***
> - ***Did a huge merger between Marriott and Starwood in 2016 lead either company to lose full sight of its corporate-wide technology and security risk?***
>
> * * *
>
> Most details of the breach are still unclear and pending investigation, the company said. The company said it was investigating all aspects of the attack, including how it occurred, whether unencrypted payment data was accessed or why a security tripwire wasn't activated when the thefts began in 2014, among other details.
>
> But customers and investors may have deeper concerns about the time it took to detect the breach and what it means for the companies' existing security investments.
>
> Like most large companies that deal with sensitive financial data, Marriott has a sophisticated cybersecurity program with access to top-line security vendors and tools. Having a single breach, apparently from one origin, slide under the radar for four years is a big deal. Marriott will almost certainly do an internal review to find out which products failed and how.
>
> ***The event***, which the company said affected the Starwood guest reservation database, ***may also call into question how the company conducted cybersecurity due diligence prior to its merger with the rival chain***. The 2016 merger brought the W Hotel, Sheraton and St. Regis brands into the Marriott fold.  [Emphasis added]

80.     Also, on November 30, 2018 various news agencies published articles about the 2014 Starwood data breach, which included various security experts' reactions.  For example;

(a)    *Chicago Tribune*[6] – "'On a scale of 1 to 10 and up, this is one of those No. 10 size breaches. There have only been a few of them of this scale and scope in the last decade,' said Chris Wysopal, chief technology officer of Veracode, a security company", and "Security analysts were especially alarmed to learn that the breach began in 2014. 'While such failures often span months, four years is extreme', said Yonatan Striem-Amit, chief technology officer of Cybereason."

(b)    *Associated Press*[7] – "'It's an extraordinary breach at a variety of levels,' said Suni Munshani, CEO of Stamford-based data-security firm Protegrity. 'All of this easily could have been prevented. None of this data should have been left unsure and in the open, where somebody could steal it and leverage it.'"

81.    In response to this news, shares in Marriott's stock fell $6.81 or over 5.5% to close at $115.03 per share on November 30, 2018, damaging investors.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

83.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

84.    Plaintiff is a current owner of Marriott.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

---

[6]        *See* footnote 3.
[7]        *See Associated Press* article entitled "Starwood hit by cyber breach" at
https://www.apnews.com/6a8631a9bd314f2b8a988784b6358c60

85.     During the wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

86.     The Marriott Board is currently comprised of thirteen (13) members – Defendants JW Marriott, Bush, Duncan, Harrison, Henderson, Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund, Schwab, and Sorenson.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, seven (7), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

87.     The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the safety of its guests PII and PCD data.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

88.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

89.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

90.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

91.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

92.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

93.     Additionally, and on information and belief, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED**

**Defendant JW Marriott**

94.     Defendant JW Marriott is not disinterested or independent, and therefore, is incapable of considering demand because he (as its Executive Chairman) is an employee of the Company who derives substantially all his income from his employment with Marriott, making

him not independent.  As such, Defendant JW Marriott cannot independently consider any demand to sue himself for breaching his fiduciary duties to Marriott, because that would expose him to liability and threaten his livelihood.

95.    Further, Marriott admits that Defendant JW Marriott is not independent in its 2018 Proxy.

**Defendant Sorenson**

96.    Defendant Sorenson is not disinterested or independent, and therefore, is incapable of considering demand because he (as its President and CEO) is an employee of the Company who derives substantially all his income from his employment with Marriott, making him not independent.  As such, Defendant Sorenson cannot independently consider any demand to sue himself for breaching his fiduciary duties to Marriott, because that would expose him to liability and threaten his livelihood.

97.    Defendant Sorenson is also a defendant in the securities class action entitled *McGrath v. Marriott International, Inc., et al*., Case 1:18-cv-06845 (E.D.N.Y.) (now transferred to Maryland (*In re: Marriott Int'l Customer Data Security Breach Litig.*, MDL No. 2879) (the "Securities Class Action") and faces a substantial likelihood of liability.

98.    Further, Marriott admits that Defendant Sorenson is not independent in its 2018 Proxy.

**Defendant Harrison**

99.    Defendant Harrison is not disinterested or independent, and therefore, is incapable of considering demand because she (as its Global Officer, Marriott Culture and Business Councils) is an employee of the Company who derives substantially all her income from her employment with Marriott, making her not independent.  In fact, Defendant Harrison has held various executive

offices with Marriott since 2006 and has otherwise been employed by Marriott since 1975. Additionally, Harrison is the daughter of Defendant JW Marriott.  As such, Defendant Harrison cannot independently consider any demand to sue herself for breaching her fiduciary duties to Marriott, because that would expose her to liability and threaten her livelihood.

100.    Further, Marriott admits that Defendant Harrison is not independent in its 2018 Proxy.

**Defendants Duncan, Hippeau, and Lewis**

101.    Defendants Duncan, Hippeau, and Lewis were members of Starwood's Board of Directors prior to the Marriott/Starwood merger and each received a seat on the Marriott Board as a result of this merger.  Duncan, Hippeau, and Lewis were Starwood Directors at the times of the 2014 Starwood data breach and 2015 Starwood data breach discussed herein.

102.    Additionally, Hippeau and Lewis were members of Starwood's Audit Committee. On information and belief, Starwood's Audit Committee Charter required that its members were responsible for, *inter alia*, assuring the adequacy and effectiveness of Starwood's disclosure controls and compliance systems, and otherwise meet their responsibilities as set forth in its Audit Committee Charter.

103.    As members of both the Starwood and Marriott Board of Directors continuously from the occurrence of the 2014 Starwood data breach and 2015 Starwood data breach discussed herein through disclosure, these Defendants breached their fiduciary duties of due care, loyalty, and good faith, because they, *inter alia*, allowed or permitted false and misleading statements to be disseminated by both companies as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

104.    Based thereon and for other reasons described herein, Defendants Duncan, Hippeau, and Lewis face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Bush, Duncan, Henderson, Lewis, and Muñoz**

105.    During the Relevant Period Director Defendants Bush, Henderson, Lewis, and Muñoz served as members of the Audit Committee (on information and belief, Defendant Duncan joined the Audit Committee sometime in 2018.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, assuring the adequacy and effectiveness of the Company's risk assessment and control environment, disclosure controls, and compliance systems, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

106.    Defendants Bush, Duncan, Henderson, Lewis, and Muñoz breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Additionally, these Director Defendants failed to oversee and ensure adequate cybersecurity due diligence prior to Marriott's merger with Starwood.

107.    Based thereon and for other reasons described herein, Defendants Bush, Duncan, Henderson, Lewis, and Muñoz face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Henderson, Kellner, Lee and Reinemund**

108.    During the Relevant Period, Director Defendants Kellner, Lee and Reinemund

served as members of the Nominating and Corporate Governance Committee (on information and belief, Defendant Henderson joined the Nominating and Corporate Governance Committee sometime in 2018). Pursuant to the Company's Nominating and Corporate Governance Committee Charter, the members of the Nominating and Corporate Governance Committee are responsible for, *inter alia*, developing corporate governance principles and reviewing the principles on a regular basis for necessary changes, making recommendations regarding the effective functioning of the Board such as the quality, quantity and timeliness of information furnished to Directors, and otherwise meet their responsibilities as set forth in the Nominating and Corporate Governance Committee Charter as set forth herein.

109. These Director Defendants breached their fiduciary duties by failing to develop and/or implement adequate corporate governance principles and further failed to ensure that the Board was effectively functioning as evidenced by the conduct alleged herein.

110. Based upon the foregoing and other facts contained herein, Director Defendants Henderson, Kellner, Lee and Reinemund face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants JW Marriott, Bush, Duncan, Harrison, Henderson,**
**Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund, Schwab, and Sorenson**

111. All of the Director Defendants failed to adequately conduct cybersecurity due diligence prior to the Marriott/Starwood merger, failed to adequately protect Marriott guests from cyber threats during the years of this data breach and otherwise maintain adequate internal controls, breached Marriott's Business Conduct Guide and Governance Principles, and continuously misled Plaintiff and the investing public about the adequacy of Marriott's data and other security.

112. Based upon the foregoing and other facts contained herein, Director Defendants JW Marriott, Bush, Duncan, Harrison, Henderson, Hippeau, Kellner, Lee, Lewis, Muñoz, Reinemund,

Schwab, and Sorenson face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duties

113.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

114.   The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

115.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

116.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to Marriott, the Director Defendants failed to adequately conduct cybersecurity due diligence prior to the Marriott/Starwood merger, failed to adequately protect Marriott guests from cyber threats during the years of this data breach and otherwise maintain adequate internal controls, breached Marriott's Business Conduct Guide and Governance Principles, and continuously misled Plaintiff and the investing public about the adequacy of Marriott's data and other security, rendering them personally liable to the Company for breaching their fiduciary duties.

117.   The Director Defendants had actual or constructive knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

118.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

119.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

120.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

121.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

122.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

123.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

124.    Plaintiff, on behalf of Marriott, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Director Defendants for Gross Mismanagement

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

127.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

128.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### Against Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    During the relevant period, Defendants disseminated or approved public statements that failed to disclose that (1) Marriott's and Starwood's computer systems that stored its customers' personal data were not secure; (2) there had been unauthorized access on Starwood's network since 2014; (3) consequently, the personal data of approximately 500 million Starwood guests and sensitive personal information of approximately 327 million of those guests may have been exposed to unauthorized parties; (4) Marriott failed to complete adequate cyber security due

41

diligence during the Marriott/Starwood merger; (5) Marriott lacked internal controls to timely detect data breaches; and (6) as a result, Marriott's public statements were materially false and/or misleading at all relevant times..  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

131.    As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

132.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 26, 2019

GAINEY McKENNA & EGLESTON

By:  */s/ Gregory M. Egleston*
     Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, JOHN MOORE, have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  I further declare that I am a current holder, and have been a holder at all relevant times, of Marriott International, Inc. stock.

2/22/2019
February _____, 2019

DocuSigned by:

*John Moore*
_____
JOHN MOORE